IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MISHELLE B.[1]<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | ) | Case No. 17-cv-01098-CJP[2] |

**MEMORANDUM and ORDER**

In accordance with 42 U.S.C. § 405(g), Mishelle B. ("Plaintiff") seeks judicial review of the final agency decision denying her application for Supplemental Security Income ("SSI") benefits pursuant to 42 U.S.C. § 423.

**Procedural History**

Plaintiff applied for SSI in August 2013, alleging a disability onset date of May 13, 2013. (Tr. 167-70). Plaintiff's application was denied at the initial level and again upon reconsideration. (Tr. 80-86, 89-101). Plaintiff requested an evidentiary hearing, which Administrative Law Judge ("ALJ") Gwen Anderson conducted on May 3, 2016. (Tr. 40-79). ALJ Anderson reached an unfavorable decision on October 25, 2016. (Tr. 15-39). The Appeals Council denied Plaintiff's request for review, (Tr. 1), rendering the ALJ's decision the final agency decision. *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008). Plaintiff exhausted

---

[1] The Court will not use plaintiff's full name in this Memorandum and Order in order to protect her privacy. See FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.
[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. § 636(c). See Doc. 29.

all of her administrative remedies and filed a timely Complaint in this Court. (Doc. 1).

## Issues Raised by Plaintiff

Plaintiff argues the ALJ erroneously failed to articulate her reasoning for adopting and rejecting medical opinions in the record.

## Applicable Legal Standards

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to

[3] The statutes and regulations pertaining to Disability Insurance Benefits ("DIB") are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011) (citation omitted).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically

be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (reasoning that under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. . . . If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997) (overruled on other grounds); *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See, e.g., Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010) (citing *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002)).

## The ALJ's Decision

ALJ Anderson found Plaintiff had not engaged in substantial gainful activity since August 26, 2013. (Tr. 20). She had severe impairments of status post fractures of the upper and lower limbs, osteoarthritis, and obesity. (Tr. 21). Plaintiff's impairments did not meet or equal a listing. (Tr. 24). She had the RFC to perform sedentary work with several additional limitations. (Tr. 25). Plaintiff could not perform any past relevant work but other jobs existed in significant numbers in the national economy that Plaintiff could perform. (Tr. 32). Thus, ALJ Anderson determined Plaintiff was not disabled. (Tr. 33-34).

## The Evidentiary Record

The following summary is directed at Plaintiff's arguments.

### *1. Agency Forms*

In her agency forms, Plaintiff alleged that broken arms, legs, and hips, which she sustained in a motor vehicle accident, limited her ability to work. (Tr. 190). Pain made it difficult for her to sleep. She needed help dressing, bathing, caring for her hair, shaving, using the toilet, and getting in and out of bed. She could not perform house or yard work because of physical injuries and could not drive because of psychological issues. She could only lift up to 5 pounds and walk for 20 paces. She was prescribed a walker, a wheelchair, and a brace, which she "always" used. (Tr. 206-11).

In a later dated report, Plaintiff said she could not stand or walk for over one minute, bend, stoop, kneel, or lift with her left arm. (Tr. 216).

***2. Medical Records***

On May 13, 2013, Plaintiff was involved in a head-on motor vehicle crash while travelling 50 miles-per-hour. She sustained an open fracture of the left humerus, a closed fracture of the right tibia or fibula, a left acetabular fracture, a dislocated hip, and a right forearm fracture. Plaintiff underwent several surgeries to repair the fractures and was admitted to the intensive care unit afterwards. Plaintiff saw occupational and physical therapists while hospitalized, who recommended acute rehab for disposition. Plaintiff was discharged on June 4, 2013 with instructions to follow-up with orthopedics and her primary care physician. (Tr. 284-88).

Plaintiff followed-up with Dr. Stanly Sidwell at SIH Healthcare on June 4, 2013 with complaints of arm pain. Dr. Sidwell opined Plaintiff was progressing

well from her injuries. She still had an external fixation device on the left humerus and shoulder, and her right arm was in a splint. However, she had been released for full weight bearing on the right side with a boot and could move her hand and wrist well. Dr. Sidwell believed Plaintiff would make a full recovery. (Tr. 737-38).

An x-ray of Plaintiff's left forearm from July 5, 2013 showed an external fixator apparatus attached to the ulna and distal humerus and a partially visualized comminuted midshaft humerus fracture. (Tr. 357). Images of her left hand were normal. (Tr. 358).

X-rays of Plaintiff's left knee from June 10, 2013 showed calcific densities in subcutaneous fat of the anterior inferior knee area, likely secondary to old hematoma. (Tr. 359). Images of her sacrum/coccyx showed no displaced or definite fracture of the sacrum or coccyx, prior metallic fixation for a fracture at the left acetabulum, and some degenerative changes at the right hip joint and in the lower lumbar spine. (Tr. 360).

On August 2, 2013, plaintiff presented to the emergency room with increased left forearm pain. An x-ray showed intact and well-aligned osseous structures. There was a lucency in the ulnar surrounding the external fixation screw in the shaft of the proximal ulna, which was concerning for infection. Plaintiff's physician prescribed her Percocet and Keflex and discharged her to home. (Tr. 567-70).

Plaintiff underwent a procedure to remove the hardware in her left humerus on August 7, 2013. Following surgery, she demonstrated intact motor skills and sensation to light touch of the left upper extremity. Her radial pulses were two plus. X-rays showed a comminuted, displaced mild humeral shaft fracture with no significant change in alignment. She was discharged and instructed to remain non-weight bearing on the left upper extremity, elevate the extremity above her heart at all possible times, perform activity as tolerated, and participate in physical and occupational therapy. (Tr. 573-84).

Plaintiff presented to Dr. Laurain Hendricks at SIHF Alton Health Center on September 9, 2013 for a physical therapy referral. On exam, she was positive for back and joint pain, joint swelling, muscle weakness, and gait disturbance. Plaintiff's left arm was in an immobilizing cast. (Tr. 588-90).

On October 16, 2013, Plaintiff presented to the emergency department for headaches. A musculoskeletal exam was normal and she walked with a normal gait. (Tr. 661-62).

Plaintiff also presented to Dr. John Boudreau at SLU Hospital's Orthopedic Department on October 16, 2013. She was doing well following her procedures and denied any interval problems between visits. She was weight bearing as tolerated on her bilateral lower extremities. She was adhering to a two-pound weight bearing limit with her left upper extremity. She denied any pain in any of her extremities, but reported a subjective decreased range of motion in her left elbow that may have been due to her left arm brace. On exam, Plaintiff's wounds

on the left upper extremity were well-healed without signs of infection or inflammation. She had terminal extension and flexed to about 120 degrees. She had full supination and pronation. Sensation was intact to light touch in her entire left upper extremity and she was able to make an "okay" sign, cross her finger, and abduct and adduct her fingers without any problems. She could also give a thumbs up sign. She had full wrist extension and flexion motion. Her strength was good, overall, at four plus to 5/5. She had a palpable radial pulse. Her left hip had good range of motion and there was no tenderness to palpation in the left groin area. She had good knee and ankle range of motion as well. She was neurovascularly intact distally in her left lower extremity. The surgical incision on her right lower extremity was well-healed, and she had a full range of motion of her right knee and right ankle. There was no tenderness to palpation over the previous fracture sites. Sensation was intact to light touch over the sural/saphenous/superficial peroneal/deep peroneal/tibial nerve distribution. Moto was intact in EHL/FHL/GSC/TA muscle groups. She had a palpable dorsalis pedis pulse. Images showed well intact hardware in her pelvis with no signs of failure, intact right tib-fib hardware with no signs of failure, a well-healed fracture in the left acetabulum, and tib-fib with adequate callus formation. Her left humerus showed interval changes consistent with good callus formation, but the fracture site was still visible. X-rays of her left humerus showed a left humeral fracture with increased bridging callus; open reduction internal fixation of the left acetabular fracture without interval change in appearance; and fibular and

internally stabilized right tibial fracture with interval healing. Dr. Boudreau instructed Plaintiff to continue to weight bear as tolerated on her bilateral lower extremities; advance to a five-pound weight bearing limit with her left upper extremity; discontinue use of the fracture brace; start home exercises; and follow-up in six weeks. (Tr. 607, 613-14).

Plaintiff presented to the emergency department on November 17, 2013 for headaches. Her musculoskeletal exam was normal, and she walked with a normal gait. (Tr. 645-46).

On November 26, 2013, Plaintiff followed-up at SLU Hospital's Orthopedic Department. She had done well following her procedures and denied any interval problems between visits. She was weight bearing as tolerated on the bilateral lower extremities. She was minimally weight bearing in her right upper extremity and just lifting light objects around the house. She denied pain in any of her extremities. She reported she was not going to pursue physical therapy because she was exercising at home instead. Her ex-fix pins were well-healed without any signs of infection or inflammation. She had a decreased range of motion of the left upper extremity with flexion to about 140 degrees of flexion and full extension. Her sensation was intact to light touch in the left upper extremity. Her left hip showed good range of motion and there was no tenderness to palpation in the left groin area. Plaintiff was neurovascularly intact distally in her left lower extremity. Her right lower extremity showed well-healed surgical incisions. She had a full range of motion of her right knee and right ankle. There was no tenderness to

palpation over the previous fracture sites. Sensation was intact to light touch and she had a palpable dorsalis pedis pulse. Images of her left humerus, left acetabulum, and right tibia/fibula showed well intact hardware in her pelvis with no signs of failure. The hardware in her right tibia/fibula was intact with no signs of failure. Her fracture in her left acetabulum and right tib-fib were well-healed with adequate callus formation. Her left humerus showed interval changes consistent with good callus formation. Plaintiff's physician instructed her to weight bear as tolerated on her bilateral lower extremities and left upper extremity. She was instructed to continue her home exercises and follow-up in three months. (Tr. 600-01).

Plaintiff presented to the emergency department on February 10, 2014 with knee, hip, and left shoulder pain after falling on ice that same day. Images of her hip showed no acute fracture. Degenerative changes of the left hip were present. Images of her left knee showed no acute fracture. There were bony/calcific densities anteromedial aspect, likely due to prior trauma, secondary to old hematoma, and evidence of some minor degenerative changes. Images of her pelvis demonstrated no acute fracture, postsurgical changes of her left hip, and mild degenerative changes of the right hip. Images of Plaintiff's left shoulder showed no acute fracture and an old fracture deformity of the left humerus. Plaintiff was diagnosed with contusions and a strain. (Tr. 626-42).

On February 26, 2014, Plaintiff returned to SLU Hospital's Orthopedic Department for a routine follow-up with Dr. Jonathan Guevara. She had been

weight bearing as tolerated on the bilateral lower extremities and weight bearing as tolerated on the bilateral upper extremities. Her right knee popped sometimes but she had no other complaints. Plaintiff reported soreness in her left hip that decreased over time. The wounds on her left upper extremity were well-healed. On exam, her range of motion was five degrees extensor lag to about 130 degrees of flexion, which was decreased from the contralateral side by about 15-20 degrees. Sensation was intact to light touch in the median/radial/ulnar nerve distribution. Motor was also intact. The bilateral lower extremities showed a full range of motion of all major joints. The exam was otherwise unremarkable. X-rays of her left humerus showed a healed humeral shaft fracture and unchanged alignment. X -rays of her left pelvis showed intact internal hardware and healed acetabular fracture. Dr. Guevara suggested Plaintiff weight bear as tolerated and continue activity as tolerated, within posterior hip precautions on the left side. He instructed Plaintiff to return to the clinic at her "1-year mark" for a follow-up. (Tr. 694-95).

Plaintiff presented to the emergency department on August 10, 2014 with abdominal pain. On exam, she demonstrated a normal range of motion in all four extremities, she was non-tender to palpation, distal pulses were normal, and she had no edema. (Tr. 783-90).

Plaintiff followed-up with Southern Illinois Healthcare on October 1, 2014. She reported bilateral leg pain, below the knee. She was evaluated and instructed to return as needed. (Tr. 713).

Plaintiff presented to the emergency department on February 4, 2015 after slipping and falling on ice again. She had pain in her left hip, hand, and wrist, and right knee. On exam, she had a normal range of motion in all four extremities, was non-tender to palpation, distal pulses were normal, and she had no edema. Plaintiff's gait was normal and she was able to move all extremities without pain. X-rays of her left hip showed hardware compatible with the internal fixation of a previous fracture. No acute abnormalities were seen. X-rays of Plaintiff's left wrist were normal. X-rays of the right knee showed previous internal fixation of the right tibia. No other abnormalities were seen. X-rays of Plaintiff's pelvis showed previous internal fixation of a fracture and mild to moderate right hip degenerative change with perhaps minimal progression compared to a previous image from February 2014. Plaintiff was instructed to take Tylenol or ibuprofen and follow up with her primary care physician if the symptoms persisted. (Tr. 796-804).

Plaintiff presented to the emergency department on April 11, 2015 with a urinary tract infection. She denied myalgia, muscle weakness, joint pain, and back pain. (Tr. 807-13).

Plaintiff followed-up with Dr. Hendricks on March 5, 2015. She reported arthralgias, joint pain, and numbness of her left arm. On exam, she demonstrated normal tone and motor strength throughout as well as a normal range of motion in all four extremities. She was non-tender to palpation and distal pulses were normal. Her gait and station were normal. (Tr. 710-12).

On May 27, 2015, Plaintiff presented to Dr. Michael Hubbard at SLU Hospital's Orthopedic Department for a two-year follow-up. She had a full range of motion of the left elbow and shoulder, a full range of motion of the right wrist and elbow, and some pain with hip internal rotation. She had a positive straight leg raise test. X-rays showed a healed left humeral shaft fracture and healed fracture of the tibia and fibula. She was assessed with an open fracture of the left humerus, with routine healing, subsequent encounter; tibia fracture, right, closed with routine healing; dislocated left hip; left acetabular fracture with routine healing; and right-sided low back pain with right-sided sciatica. Dr. Hubbard told Plaintiff to weight bear as tolerated on the upper and lower extremities. He listed Plaintiff's work status as full duty. Dr. Hubbard ordered x-rays of Plaintiff's pelvis, right forearm, right tibia, and left humerus and referred her to spine service for back pain. (Tr. 843-44).

Plaintiff saw Dr. Andrew McNamara at SLU Orthopedic Spine on August 17, 2015. She reported back and leg pain since the motor vehicle accident in May 2013. She had some numbness over the bottom of her right foot, with pain that extended from the low back on the right side into her posterior thigh and lateral leg. Plaintiff was tender to palpation over her back. Her range of motion of the back was normal. Her motor strength was 5/5 in the upper and lower extremities. Straight leg raising test was negative and she had no clear weakness. X-rays of the lumbar spine revealed enhanced lordosis with good disc height and no fracture of loss of alignment. Dr. McNamara concluded the pain was likely due to

nerve root irritation in her back, possibly the S1 nerve root. He recommended NSAIDs, Aleve, or Ibuprofen, restarting Gabapentin, physical therapy, and following-up in three months. (Tr. 845-48).

Plaintiff presented to the emergency department on November 22, 2015 after a motor vehicle accident. She had pain in her left low back, left hip, and left shoulder. She was able to walk and had a normal range of motion in all four extremities. She was tender to palpation over the left shoulder. Distal pulses were normal and she had no edema. X-rays of Plaintiff's left shoulder showed no acute fracture or dislocation. Plaintiff was given Naprosyn and Flexeril and discharged to home. (Tr. 816-23).

***3. State-Agency Consultant Opinions***

State-agency consultant Dr. B Rock Oh conducted an RFC assessment of Plaintiff on January 16, 2014. He opined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push and/or pull an unlimited amount. Plaintiff could occasionally climb ramps, stairs, ladders, and scaffolds, stoop, kneel, crouch, and crawl. (Tr. 83-85).

State-agency consultant Dr. Julio Pardo conducted an RFC assessment of Plaintiff on July 25, 2014. He opined Plaintiff could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an

eight-hour workday; and push and/or pull an unlimited amount. Plaintiff could occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl, and could never climb ladders, ropes, or scaffolds. She was limited in her ability to reach overhead, bilaterally. She should avoid concentrated exposures to hazards. (Tr. 96-99).

### *4. Evidentiary Hearing*

On May 3, 2016, ALJ Anderson held an evidentiary hearing at which state-agency consultant Dr. Mark Farber testified. Dr. Farber opined Plaintiff could perform sedentary work with additional restrictions. Plaintiff could sit for roughly six hours and stand and/or walk for up to two hours in an eight-hour day with usual breaks. Plaintiff was capable of normal fingering, handling, and reaching and could occasionally stoop, bend, crouch, and use stairs and ramps. Plaintiff should avoid unprotected heights, using ropes or ladders, crawling, or kneeling. Dr. Farber noted that Plaintiff's subjective pain might interfere with her ability to work, but that would not preclude her from working. (Tr. 64-69). Dr. Farber conducted an RFC assessment on Plaintiff again on June 5, 2016. He reiterated his previous opinion, and added that Plaintiff could lift/carry up to 10 pounds occasionally. (Tr. 914-16).

## **Analysis**

Plaintiff argues the ALJ's decision was erroneous because she did not explain how she weighed the medical opinions in the record. An ALJ has a duty to "minimally articulate his or her justification for rejecting or accepting specific

evidence of disability." *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988). However, an ALJ need not address every piece of evidence, so long as she does not ignore an entire line of evidence contrary to her ruling. *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999).

ALJ Anderson gave "significant" weight to the opinions of Dr. Farber, Dr. Oh, and Dr. Pardo, who concluded Plaintiff could perform sedentary work. She gave "considerable" weight to Dr. Boudreau's opinion from May 2015, which released Plaintiff to full duty work and weight bearing as tolerated.[4]

Although the ALJ's analysis was somewhat lacking, Plaintiff has failed to point to any evidence the ALJ ignored that was contrary to her ruling. Instead, Plaintiff presents an alternative interpretation of the evidence. She argues Dr. Boudreau opined Plaintiff could lift more than five pounds, bilaterally, two years after the motor vehicle accident. Therefore, it is reasonable to infer that prior to this period, Plaintiff could not lift more than five pounds, which would preclude sedentary work. Plaintiff's argument is futile. "[T]he ALJ's decision, if supported by substantial evidence, will be upheld even if an alternative position is also supported by substantial evidence." *Scheck v. Barnhard*, 357 F.3d 697, 699 (7th Cir. 2004). Dr. Boudreau never offered any specific opinions about Plaintiff's weight bearing limitations with the right upper extremity. Therefore, the ALJ was entitled to adopt the opinions from the state-agency consultants, who were the

[4] Dr. Boudreau treated and/or oversaw Plaintiff's treatment on numerous occasions following her 2013 motor vehicle accident in which she sustained the majority of the injuries at issues. Several of Dr. Boudreau's treatment notes contain opinions from residents under Dr. Boudreau's supervision, which Dr. Boudreau concurs with. The ALJ refers to all of these opinions solely as Dr. Boudreau's. For efficiency's sake, the Court will do the same.

only doctors of record to render opinions on the matter. *See id.* at 701 ("The ALJ did not reject any evidence. . . there was *no evidence* which would support [the plaintiff's] position. . .the letter from [the plaintiff's] treating physician [] did not address the issue. . . It was unnecessary for the ALJ to articulate her reasons for accepting the state agency physicians' determination of not disabled."). As to the left upper extremity, Dr. Boudreau instructed Plaintiff to begin lifting up to five pounds in October 2013, and by November 2013, released Plaintiff to weight bearing as tolerated on the left upper extremity. Nothing in Dr. Boudreau's records contradict the ALJ's conclusion that Plaintiff could perform sedentary work during the relevant period.

Plaintiff also argues the ALJ failed to discuss evidence that supports her allegations of disability. "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

Plaintiff contends the ALJ did not mention a positive straight leg raising test and referral to spine services for her back pain on the same day Dr. Boudreau released her to full duty work. However, the ALJ specifically noted, "On May 27, 2015, the claimant saw treating orthopedist Dr. Boudreau stated [sic] that the claimant was released to full duty work . . . At that time, Dr. Boudreau noted positive straight leg raising and complaints of lower back pain with radiation in the bilateral legs. . ." (Tr. 28). True, the ALJ did not mention the referral to

spine services. However, she did mention Plaintiff's complaints of back pain and on review, the Court "give[s] the opinion a commonsensical reading rather than nitpicking at it." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (internal citation omitted).

In sum, it remains axiomatic that Plaintiff bears the burden of supplying adequate evidence to prove her claim of disability. *Scheck*, 357 F.3d at 702. Plaintiff fails to point to any evidence that contradicts the ALJ's decision or renders it illogical. ALJ Anderson relied on three state-agency consultant opinions in determining Plaintiff was not disabled, and Plaintiff does not set forth any medical opinions finding otherwise. Substantial evidence supports the ALJ's decision.

## Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **AFFIRMED.**

The Clerk of Court is directed to enter judgment in favor of defendant.

**IT IS SO ORDERED.**

**DATE: September 27, 2018.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**